**Stanley A. RODOWICZ, et al.**

v.

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, et al.**

**Civil A. No. 93–30075–MAP.**

United States District Court, D. Massachusetts.

Feb. 12, 1996.

---

Keith A. Minoff, John C. Sikorski, Robinson, Donovan, Madden & Barry, Springfield, MA, for Stanley A. Rodowicz, James J. Lemon, Sigmund S. Ziemba, Barbara Binsky, Patricia A. Kennedy, Anne E. Buck, June Devine, Margaret S. Stevens.

David G. Cohen, Charles S. Cohen, Egan, Flanagan & Cohen, PC, Springfield, MA, for Massachusetts Mutual Life Insurance Company, Massachusetts Mutual Voluntary Termination Program.

*MEMORANDUM REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFFS' MOTION TO RECONSIDER*

PONSOR, District Judge.

## I. *INTRODUCTION*

In April 1994, plaintiffs, former employees of Massachusetts Mutual Life Insurance Company ("MassMutual"), brought this suit, alleging that defendants—MassMutual and the Massachusetts Mutual Voluntary Retirement Program—misled plaintiffs about future plans to offer a sweetened severance package, in violation of federal and state law. On July 27, 1994, over plaintiffs' arguments, this court held that the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.,* preempted plaintiffs' state law claim for misrepresentation and dismissed it accordingly. *See Rodowicz v. Mass. Mut. Life Ins. Co.,* 857 F.Supp. 992, 999 (D.Mass.1994).

On December 14, 1995, the First Circuit handed down its decision in *Belanger v. Wyman–Gordon Co.,* 71 F.3d 451 (1st Cir.1995). On December 19, 1995, this court requested supplemental memoranda from the parties addressing whether, in light of *Belanger,* the severance package at issue falls within the

scope of ERISA. At that time, the court had under advisement defendants' motion for summary judgment and plaintiffs' motion for partial summary judgment on their remaining ERISA-based claims. Along with their supplemental memorandum, plaintiffs submitted a motion to reconsider the July 1994 ruling (Docket No. 83).

After reviewing the parties' submissions and the relevant case law, the court has concluded that ERISA does not govern the severance plan in this case. Accordingly, the court will dismiss plaintiffs' ERISA-based claims. The defendants' motion for summary judgment and the plaintiffs' motion for partial summary judgment will be denied as moot. The motion to reconsider will be allowed and the misrepresentation claim will be reinstated.

## II. *FACTUAL BACKGROUND*

On October 23, 1992, MassMutual announced the Massachusetts Mutual Voluntary Termination Program ("the plan"), an early retirement severance plan open to most full-time MassMutual employees, about 4000 in number. The plan provided for a one-time, lump-sum severance bonus (subject to standard payroll deductions) equal to: (1) three weeks of salary for every year of service, up to a maximum of 78 weeks, *or* (2) one week of salary for each full $5000 of compensation, and a proportionate amount for an increment less than $5000, up to a maximum of 52 weeks.

MassMutual gave eligible employees until December 1, 1992 to elect to participate in the plan. At its discretion, the company could defer an employee's election date beyond the December 1 deadline, but in no case past June 30, 1993. Except for those employees the company deferred, every participant was required to leave MassMutual by December 31, 1992. Plan participants were not eligible for reemployment for at least one year after termination.

About ten MassMutual employees prepared and administered the plan, and another ten or so were used to help educate eligible employees.

The plan included an appeals process for employees to whom the company denied benefits. Upon written notice stating the grounds for appeal, the plan administrator was required to conduct a full review and, in no longer than 120 days, provide written notice of her decision to the employee. The plan administrator's decision, if supported by substantial evidence, would be deemed conclusive as between the parties.

In the end, 370 employees participated in the plan, of whom 101 were given deferred election dates.

## III. *DISCUSSION*

■ The question here is whether the MassMutual severance plan constitutes an "employee benefit plan" within the meaning of ERISA. *See* 29 U.S.C. § 1002(2)(A). In general, ERISA does govern employee severance plans. *See id.* at §§ 186(c), 1002(1). However, the statute's reach is limited to those plans that involve "continuing administrative and financial obligations by the employer to the behoof of employees or their beneficiaries." *Belanger,* 71 F.3d at 454 (citing *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)).

In *Fort Halifax,* the Supreme Court held that a Maine statute mandating a one-time, lump-sum payment to employees in the event of a plant closure did not fall within the scope of ERISA. 482 U.S. at 12, 107 S.Ct. at 2218. According to the First Circuit, the Court was swayed by two of the statute's "cardinal goals." *See Belanger* 71 F.3d at 454. The Court noted that (1) Congress had passed ERISA to protect plan administrators from a "patchwork scheme" of employee-benefit regulations, and (2) Congress intended the statute to protect the financial integrity of benefit funds over the long term. *See* 482 U.S. at 12, 15–16, 107 S.Ct. at 2217, 2219–20. The Maine statute, the Court concluded, did not implicate these concerns because it created no "need for an ongoing administrative program for processing claims and paying benefits." 482 U.S. at 12, 107 S.Ct. at 2218.

In *Simas v. Quaker Fabric Corp. of Fall River,* 6 F.3d 849 (1st Cir.1993), the court asked whether ERISA reached Massachusetts' "tin parachute" statute, which required

employers to make payments to employees who lose their jobs within a specified period before or after a corporate takeover. Unlike the Maine statute in *Fort Halifax*, the court explained, the Massachusetts statute required an ongoing administrative mechanism for determining whether a company had terminated an employee within a designated time period and, more important, whether the terminated employee was eligible for unemployment benefits under state law. *Id.* at 853.

Applying *Fort Halifax*, the court held that the "tin parachute" legislation imposed sufficiently elaborate and ongoing administrative burdens on employers to trigger ERISA protection. *Id.* Still, the court acknowledged the unsettled quality of the standard it was applying. "Given the Supreme Court's reasoning in *Fort Halifax*," it noted, "there is no way to be certain where it would draw the line." *Id.* The court warned that decisions will turn on "a matter of degrees," because "under *Fort Halifax* degrees are crucial." *Id.*

The *Belanger* decision clarifies the proper calibration of these "degrees." In *Belanger*, the defendant company offered a series of severance plans to entice its employees into early retirement. Each plan amounted to a variation on the same theme: a one-time, lump-sum severance bonus equal to a week's salary for each year of employment with the company. *See* 71 F.3d at 452–53. Plaintiffs, former employees who had participated in one plan (which included a cap on the bonus), filed their lawsuit after the company announced a new plan (which did not cap the bonus). *Id.* at 453.

The court held that "[t]aken singly, the early retirement offers involve precisely the kind of one-time, lump-sum payment that the *Fort Halifax* Court clearly excluded from the pantheon of ERISA plans." *Id.* at 455. The court continued:

> The company's offers hinged on a purely mechanical determination of eligibility and, if accepted, required no complicated administrative apparatus either to calculate or to distribute the promised benefit. The offers pivoted on a single, time-specific event. They did not involve promises that had to be kept over a lengthy period, nor did the company thereby make any lasting financial commitment of a type that might implicate ERISA's substantive protections. The bottom line is that the company did no more than propose to write a single check to each eligible employee who accepted an early retirement offer.

*Id.*

The MassMutual plan bears a striking resemblance to the individual severance packages in *Belanger*. MassMutual offered the bonus to virtually all full-time employees, with the exception of certain categories of employees set forth in the plan document. The administrative burden on the company—a staff of ten and a one-step appeals process—was by no means extreme or unduly complicated. Like *Belanger*, the offers turned on a single, time-specific event. And given the nature of a one-time, lump-sum severance bonus, the company was not required to make a long-term financial commitment to any participating employee.

Defendants point to several factors which, they argue, show that the plan imposed heavy administrative burdens, but the facts indicate otherwise. The substance of the plan document—only 12 pages—simply communicates the basic terms of the offer. The plan's administrative procedures appear straightforward, and defendants have produced no evidence to show that the plan administrator experienced any difficulty determining eligibility or handling appeals, if indeed any were filed. Also, the large number of participating employees—370 in this case—does not, *ipso facto*, generate complexity. What matters is the company's ongoing commitment to plan participants, not the amount of short-term paperwork.

Two matters deserve special mention. The first is the plan's exclusion of employees who were "involuntarily terminated" by the company during the election period. According to the plan document, "involuntary termination" refers to termination by way of "a performance release," "position elimination," or "egregious behavior or discharge." These "involuntary" terminations, it might be argued, could also be labelled "for cause" ter-

minations. The First Circuit has indicated that this kind of termination may require "judgments based on information well beyond the employee's date of hiring and termination" and "ongoing administrative obligations." *See Simas,* 6 F.3d at 853. Given this, at first glance it might appear that ERISA would govern the plan in this case.

A close reading of the MassMutual plan undercuts this suggestion. First, and most important, the plan's definition expressly refers to terminations "for any reason or no reason at all," thus excusing the employer for *any* termination not supported by legal cause. Second, the plan administrator had full and independent authority to apply the exclusion. In *Simas,* by contrast, a terminated employee's eligibility for unemployment compensation—a vital ingredient in the "tin parachute" legislation—required that the employee not be dismissed for cause within the meaning of state law. *Id.* Funnelling state law into a plan clearly imposes a greater burden on an employer than (as here) concentrating all decision-making authority in a single plan administrator. Moreover, unlike the legislation in *Simas,* which required a company to make for-cause evaluations for at least a two-year period, the MassMutual plan did not require the company to make decisions over a long period of time. *See id.*[1]

The second matter concerns the company's decision to defer the election dates of certain plan participants. The company deferred the election dates of 101 employees, in effect extending the severance plan beyond a single, time-specific deadline. These deferrals, however, imposed no ongoing administrative burden on the company. In each case, the company simply calculated the severance payment using the deferred termination date, then distributed the one-time, lump-sum bonus. In no case did MassMutual defer an employee's election date beyond June 30, 1993, and the company apparently saw no need to establish a special fund to safeguard the deferred benefits. With the exception of the deferred termination date, the mechanics of the plan remained exactly the same.

In sum, the Voluntary Termination Program did not involve the "continuing administrative and financial obligations" representative of an ERISA plan. The court must therefore dismiss plaintiffs' ERISA-based claims.

## IV. *FUTURE PROCEEDINGS*

■ The decision based upon *Belanger* that ERISA does not govern the defendant's plan necessitates a rather dramatic change in direction for this case, with unforeseen ramifications. To understand this, some background is necessary.

The complaint was originally filed in three counts, the first two alleging violations of ERISA and the third asserting common law misrepresentation. In response to this complaint the defendants filed a motion to dismiss all three counts, the argument with regard to the third count being that all common law causes of action (including misrepresentation) were preempted by ERISA.

Along with their opposition to the motion to dismiss, the plaintiffs filed a motion to amend, seeking to add thirteen additional counts, all founded on common law or state statutory theories. On July 27, 1994 the court denied, in part, defendants' motion to dismiss with regard to the two ERISA counts but allowed the motion, *in toto,* with regard to the third count due to ERISA preemption. At the same time the court denied plaintiffs' motion to amend, finding that it would be futile because the counts plaintiffs sought to add were all preempted by ERISA as well. This lawsuit has proceeded since July 27, 1994 as a pure ERISA case.

As this memorandum demonstrates, the *Belanger* decision now makes it clear that this case should not be viewed as governed by ERISA. Thus, all remaining counts now asserted in the complaint should be dismissed. Ordinarily, the court would do this, comfortable in the knowledge that this case

---

1. The plan at issue in *Belanger,* which defendants have submitted to the court, also excluded employees terminated for cause. The *Belanger* court apparently felt no compulsion to square that exclusion with the complicated features of the "tin parachute" legislation in *Simas.*

lacked federal question jurisdiction from the beginning and that plaintiffs could pursue their remedies (if any) in state court.

Unfortunately, all parties seem to agree that, due to the passage of time since July 1994, plaintiffs may well have lost their right to pursue their common law or statutory remedies in the courts of the Commonwealth. The Massachusetts renewal statute, Mass. Gen.L. ch. 260, § 32, permits the plaintiffs to file a state court action only within a year of dismissal and only if the dismissal is deemed a "matter of form." *Liberace v. Conway,* 31 Mass.App.Ct. 40, 44–45, 574 N.E.2d 1010 (1991). Given these criteria, it is doubtful whether plaintiffs would be able to convince a state court judge to permit renewal of their state law claims. Defendants' counsel has stated, understandably, that he will oppose any attempt to do so.

It would be distinctly unfair to deprive plaintiffs of an opportunity to pursue their possible common law and state statutory remedies merely as an outcome of the rapidly-evolving nature of ERISA law. The simplest way to remedy this unfairness is the suggestion of the plaintiffs: to reconsider the court's July 27, 1994 ruling dismissing Count III of plaintiffs' original complaint, alleging misrepresentation, and resurrect this common law cause of action as a matter of discretion, to permit it to be addressed on the merits. Since the theory offered to support dismissal in 1994, ERISA preemption, is obviously no longer viable, reconsideration is appropriate.

Based upon the foregoing, the court will allow plaintiffs' motion to reconsider, will vacate its ruling dismissing Count III of the original complaint, the cause of action based upon misrepresentation, and will retain jurisdiction over this common law claim as a matter of discretion. The court will set the case down for a case management conference to determine future proceedings, including possible further motions to amend (by plaintiffs) or for summary judgment (by defendants). The purpose of this approach will be to give all parties an opportunity to place their arguments on the merits before the court and reduce the distortion generated by the impact of *Belanger*.

### V. CONCLUSION

For the reasons set forth above, the defendants' Motion for Summary Judgment (Docket No. 59) and the plaintiffs' Motion for Partial Summary Judgment (Docket No. 68) are hereby DENIED as moot. However, the court hereby dismisses, *sua sponte,* all ERISA claims in this case on the authority of *Belanger*. The court also hereby allows plaintiffs' Motion to Reconsider (Docket No. 83) and vacates its order of July 27, 1994 dismissing Count III of the original complaint, asserting common law misrepresentation. The clerk will contact counsel to set a date for a case management conference.

A separate order will issue.