Bobbie ADAMS; Bobby Lynn Adams; Carlos Adams; David C. Adams; John Adams, Lonnie Adams; Lonnie Glenn Adams; Roger Adams; Van Adams; Curtis Asher; Gary Asher; Joe Asher; Kermit Douglas Asher; Larry Asher; Michael F. Asher; Robert E. Lee Asher; Donald Ray Bailey; John M. Bailey; Bert Baker; David L. Baker; Prentiss Darrell Baker; Richard Baker; Richard Lee Baker; Robert W. Baker; David Webb Bowling; Ernie Ray Bowling; Michael J. Bowling; Rodney Bowling; Ronald Bowling; Vernon E. Bowling; David K. Brashear; Ronald K. Browning; Robert D. Burns; Bandon Bush; Asbery Caldwell; James E. Caldwell; Jerry Caldwell; Chester Callahan; Darrell Callahan; Kelly A. Campbell; Kelly Campbell; John E. Caudill; Harvey Chappell, Jr.; Ross E. Cole; Eldon Collett; Harold Collett; Ricky Collett; Robin Collett; Douglas W. Collins; Harold Colwell; Cecil Combs; Earl Combs; Emerson Eugene Combs; Jack K. Combs; Larry Combs; Leslie H. Combs; Michael G. Combs; Randy Combs; Troy P. Combs; Bobby Coots; Wade Coots; James A. Cornett; Robert Cornett; James Couch; Kenneth Couch; Michael W. Couch; Paul W. Couch; Tommy Couch; Tommy Dwayne Couch; William Couch; Kenneth Crawford; Earl Davidson; Jerry Davidson; Bob Dixon; James R. English; Eddie Dwayne Eversole; Michael Prah Eversole; Michael T. Eversole; Virgil Eversole; Clinton Farmer; Bruce Feltner; Danny Feltner; Eddie Bruce Feltner; Eugene Feltner; John C. Feltner; Lonnie Feltner; Paul Anthony Feltner; Randy Feltner; Roderick D. Feltner; Ronald Feltner; Sylvester Feltner; Iam Herman Feltner, Jr.; Ray Lee Fletcher; Harry Jr. Francis; James Friley; Gary R. Fugate; Larry Fugate; Anthony Gibson; John Goins; Ronald W. Griffie; Freddie Grigsby; Larry Gross; Russell Gross; Floyd Henry Hacker; Shelby P. Hagans; Charles Harris; Larry Hendrix, Jr.; Jerry Hensley; Timmie Hensley; Kenneth Holland; Morgan Lee Holmes; Ira Huff; Clayton M. Jackson; Phillip Jackson; Paul E. Johnson, Willie

---

9. Because we remand on the issue of standing, we do not address any additional arguments raised by either party on appeal.

624

Johnson; Chester Jones; Larry Joseph; Raymond Joseph, Robert Joseph, III; Cletis Wells, Jr.; Hershel Dixon, Jr.; Pearl Pennington, Jr.; Richard Young, Jr; David Kilbourne; J.B. Kilbourne; Fred Kilburn; Johnny Ray Kilburn; Kenneth Lawson; Earl Lewis; Denver Lewis; Hobert Lewis; Allen Wayne Madden; Cova Maggard; James C. Maggard; Coleman McDaniel; Carter Allen Melton; Douglas K. Melton; Michael W. Melton; Randall Kent Melton; William Craig Melton; Manuel Miller; Don Morgan; Russell Douglas Morgan; Edmon Morrow; Donnie Mosley; Arthur Mullins; Cecil Murray; Clarence Patrick Napier; Daniel Napier; Harold D. Neace; Eddie Neal; Charlie North; Jerry Oliver; Bobby Joe Osborne; James J. Osborne; Marcus Osborne; Otis Osborne; Paul R. Osborne; Sherman Osborne; Timothy Otis Osborne; Lloyd Pence; Gillis Glen Pennington; Jesse Pennington; Jimmie Pennington; Thomas Wade Pennington; William I. Pennington; Eugene Pennington, Jr.; Charles E. Philpot; Billy Radford; Willard Radford; Rhonda Reid; Harold Roberts; Kenneth Roberts; Larry Roberts; Randy Roberts; Wayne Robinson; Richard Salyers; Burnis Shepherd; Leonard Shepherd Wendall Sherman, Okie Short; Garland Sizemore; Johnny E. Sizemore; Alfred Smith; Charles Edward Smith; Charles W. Smith; Hurlen L. Smith; Jimmie Southwood; Orville Sparks; D.J. Stephens; David Stidham; Buford O. Stonic; Norman Jerome Stunk; Bill Thomas; Rodney Thompson; Bobby J. Trammell; Harold Turner; Steve Walker; Wallace Warfield; Charles C. Wells; Cletis Jr. Wells; Gary Wells; John W. Wells; Ronald W. Wells; Eddie Whitaker; Everett Earl Whitaker; Jack E. Whitaker; James Whitaker; Shelvin White; Harold Williams; Hershel Williams; Kelvin L. Williams; Marcus Williams; Ronald Lee Williams; Woodrow Williams; David Wayne Woods; Denver D. Woods; Opha Woods; Ronald Woods; Anthony Wayne Wooton; Thomas H. Wright; John Doe(s); Jane Doe(s), Appellants,

v.

SUN COMPANY, INC., Sun Coal Company, Whitaker Coal Corporation and Bankers Trust Company.

No. 01–3762.

United States Court of Appeals, Third Circuit.

Submitted Sept. 12, 2002.

Decided Sept. 12, 2002.

Before SLOVITER and RENDELL Circuit Judges, and McCLURE,* District Judge.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The appellants (hereafter "Employees"), over 200 former employees of Whitaker Coal Corporation ("Whitaker"), a mining corporation owned by Sunoco, Inc. ("Sunoco"), brought this action under the Employee Retirement Income Security Act (ERISA) of 1974, 29 U.S.C. §§ 1001 *et seq.*, asserting that Defendants violated their fiduciary duties by representing the lump sum payment option selected by these employees in late 1995 to be a "one-time" offer and then extending a second offer to other employees the following year. After determining that Whitaker was not "seriously considering" a second lump sum payment option when the Employees were offered and selected such an option in late 1995, the District Court en-

tered summary judgment for the Defendants. The District Court also denied the Employees' Motion for Reconsideration.

In this appeal, the employees assert that the District Court erred as a matter of law in its application and interpretation of the "serious consideration" test enunciated in *Fischer v. Philadelphia Electric Co.,* 96 F.3d 1533 (3d Cir.1996) (*Fischer II*). Because we conclude that the District Court correctly applied the law, and that there are no genuine issues of material fact, we will affirm.

## I.

The Employees were participants in the Whitaker Coal Corporation and Affiliates Defined Benefit Pension Plan (the "Plan"), and were laid off in 1995 by Whitaker when its parent company, Sunoco, decided to exit the coal business.[1] At that time, the Plan had no lump sum payment option, but required participants to wait until at least age 55 before receiving retirement benefits. In mid–1995, in response to requests from former employees, Whitaker and Sun Coke Corporation (later Sun Coal) (hereafter "Sun"), the Plan administrator,[2] began to consider the possibility of a lump sum payment to the former employees, along with other options for the Plan, including termination.

On September 25, 1995, the Plan actuary, an employee of Pricewaterhouse Coopers (hereafter "PwC"), corresponded with Jack Allison, Vice President of Finance and Administration for Sun, setting forth three Plan options: (1) terminating the Plan (paying everyone out) on or before December 31, 1995; (2) terminating the

---

* Honorable James F. McClure, United States District Court for the Middle District of Pennsylvania, sitting by designation.

1. Whitaker retained fewer than 20 employees.

2. Sun was also owned by Sunoco, and provided financial, administrative and other services to Whitaker.

Plan (paying everyone out) on January 1, 1996; or (3) making lump sum payments only to vested terminees and layoffs on or before December 31, 1995 (with possible later Plan termination).[3] The Allison Letter went on to state that when the Plan was terminated "annuities would be purchased—at prices available in the annuity market as of the date of purchase—for retirees and beneficiaries currently receiving benefits." It concluded that because it was unlikely that Plan termination could be effectuated by year-end, Whitaker should amend to allow lump sum distributions to laid off employees and vested terminees with payment by December 31, 1995.[4] Whitaker elected the third option, deciding not to terminate the Plan at that time, and in November 1995 the Plan was amended to allow for lump sum payments to the Employees.[5] The Employees were notified of this "one-time" opportunity and permitted to elect among (1) a lump sum distribution on or before December 31, 1995; (2) an immediate 50% joint and survivor annuity to commence December 1, 1995 (for married participants); (3) an immediate straight life annuity to commence on the same date; or (4) status quo—retaining the right to a deferred annuity at retirement date. The Employees each elected to receive a lump sum distribution on or before year end.

In February 1996, Whitaker was contracted for sale and, as part of the transaction, Sunoco was to become the Plan sponsor. It was announced that the remaining plan participants would be given another opportunity to receive a lump sum pay-

ment, with the option window scheduled from the presumed date of closing, in June 1996, until August 31, 1996. Defendants assert this option was added to reduce the administrative burdens of plan merger on Sunoco; the Employees assert that it was actually planned at the time of the first. The business transaction was delayed, and the second lump sum payment window opened November 15, 1996. In the approximate one-year interval between the two windows, interest rates fell, as a result of which the lump sum payments made to the comparatively small group of remaining participants were significant larger than those made to the Employees.

The Employees filed suit in the District Court, alleging that the Defendants violated their fiduciary duties under ERISA by making a misleading representation as to the "one-time" opportunity and failing to disclose at the time of the first lump sum payment option that a second window for lump sum payments would occur. On June 12, 2001, the District Court, having considered the parties' respective motions for summary judgment, entered summary judgment for the Defendants. The District Court determined that the Employees "produced no evidence from which a [factfinder] reasonably could conclude that a second window for lump sum payments was under serious consideration at the time of the first." June 12, 2001 Memorandum at 9. This appeal timely followed.

## II.

The District Court had jurisdiction pursuant to 29 U.S.C. §§ 1132(e)-(f), and we

---

3. This correspondence is referred to hereafter as the "Allison Letter".

4. The Allison Letter also suggested that Whitaker could simultaneously "commence the Plan termination, with a goal of completing the termination by June 30, 1996."

5. Allison's undated handwritten notes on the Allison Letter indicate "Option 3", "payout retirees by annuity" and, somewhat less legibly, "merge w/SCORP." A differing copy of the Allison Letter, submitted with the Employees' Motion for Reconsideration, contains an additional notation, in different handwriting, reading "6/14 merger date—stock sale—term at date."

exercise jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary and we must "affirm summary judgment 'if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.'" *Walling v. Brady*, 125 F.3d 114, 116 (3d Cir.1997) (quoting Smith v. Hartford Ins. Group, 6 F.3d 131, 135 (3d Cir.1993)); *see also* Fed. R.Civ.P. 56(c). We review the facts in the light most favorable to the non-moving party. *See Beers–Capital v. Whetzel*, 256 F.3d 120, 130 n. 6 (3d Cir.2001). That party must, however, point to specific facts demonstrating that a genuine issue exists for trial, and may not rest upon entirely unsupported allegations. *See* Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

In accordance with its duties under ERISA, a plan fiduciary may not materially mislead the plan participants and beneficiaries. *See In re Unisys Corp.*, 57 F.3d 1255, 1261 (3d Cir.1995). More specifically, "[a] plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan." *Fischer v. Philadelphia Electric Co.*, 994 F.2d 130, 135 (3d Cir.1993) ("*Fischer I*"). A fiduciary may be liable for breach of fiduciary duty based upon misrepresentations where it either misrepresents a material fact or fails to disclose a potential change in the plan that is under "serious consideration." *See Fischer II.*[6]

An ERISA fiduciary gives "serious consideration" to a plan modification when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Fischer II*, 96 F.3d at 1539. "A specific proposal follows the preliminary steps of 'gathering information, developing strategies, and analyzing options.'" *Mushalla v. Teamsters Local No. 863 Pension Fund*, 300 F.3d 391, 398 (3d Cir.2002) (quoting Fischer II, 96 F.3d at 1539–40). It must be "sufficiently concrete to support consideration by senior management for the purpose of implementation." *Fischer II*, 96 F.3d at 1540. In addition, the discussion for implementation element requires evidence of consideration of "the practicalities of implementation." *Id.*

In support of their appeal, the Employees rely principally on the Allison Letter, which they assert evinces the Defendants' intent to make a second lump sum payout. But as noted *supra*, that correspondence contains absolutely no reference whatever to a second lump sum option. In essence, the Employees are attempting obliquely to infer this intent based solely on considerations of Whitaker's and Sunoco's presumed desire to finalize the Plan's liabilities in connection with the Plan's termination or merger. Of course, neither termination nor merger requires of-

---

**6.** In this case, the Employees assert a hybrid of these two theories, asserting that the offer of the 1995 lump sum payment as a "one-time" opportunity was an affirmative misrepresentation because the second window was under serious consideration at the time they made their elections. That is, the materiality element of the Employees' claim of misrepresentation under *Varity Corp. v. Howe*, 516

U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), can only be demonstrated by a showing that the second lump sum window was under serious consideration at the time of the first lump sum offer. *See* Appellant's Brief at 13 ("The central issue before the District court was whether 'serious consideration' of a benefit plan change existed at the time ....").

fering a lump sum payment[7] and, indeed, the undated handwritten notes on the Allison Letter indicate consideration of an annuity, apparently in lieu thereof. Moreover, even if the generalized alternatives in the Allison Letter made reference to a second lump sum opportunity, which they do not, correspondence reflecting the development of strategies and suggestion of options, without more, would not rise to the level of a "specific proposal" as we have defined it.[8] To the contrary, as the District Court correctly observed, the Allison Letter "was merely an 'antecedent step of gathering information.'" June 12, 2001 Memorandum at 8 (quoting *Fischer II* at 1539–40).

In addition, even if a specific proposal for a second lump sum payment could be gleaned from the Allison Letter, which it cannot, the Employees have presented no evidence whatsoever of consideration during 1995 of "the practicalities of implementation," such as how a second lump sum window would be communicated, to whom it would available, under what terms, or when and for how long.[9]

Similarly, the few additional handwritten notes submitted in support of the Employees' Motion for Reconsideration have, with perhaps one exception, no apparent bearing at all on the allegations of a pre–1996 time frame for the Defendants' consider-

ation of a specific second lump sum payment option. The only document that could possibly be interpreted to have some relevance is an undated note by a PwC employee that includes a reference to "1996 purchasing annuity allowed to take lump sum."[10] Although these notations may be read to indicate that someone was, at some time, considering allowing some group a second lump sum payment window in 1996, (1) there is no indication of when this was being contemplated; (2) there is no evidence it was discussed with anyone at Whitaker, Sun or Sunoco, or anyone with the authority to implement it; (3) it clearly lacks any of the detail necessary to constitute a specific proposal; and (4) it is not sufficiently formulated or finalized to amount to something discussed for purposes of implementation.

Accordingly, we agree with the District Court that the evidence raises no disputed issue of material fact as to the presence of serious consideration by the Defendants of a second lump sum payment opportunity prior to December 31, 1995.

## IV.

For the reasons set forth above, we will affirm the decision of the District Court.

7.  *See* June 12, 2001 Memorandum at 9 (rejecting Employees' assertion "that a second opportunity for lump sum payments was implicit in the phrase 'with possible later Plan termination'"). For this reason, the testimony of a Sun employee, Karen Free, that she had conversations with Allison in 1995 regarding the possible merger of the Plan with Sunoco's does not support the Employees' assertion that a second lump sum payment was being seriously considered at the time.

8.  *See Mushalla,* 300 F.3d at 399 (finding no specific proposal where information crucial to proposal's financial viability was still to be gathered and noting that "[w]ithout [such] investigation ... there could be no specific proposal").

9.  *See id.,* 300 F.3d at 400 (finding no discussion for implementation of cap increase in December where trustees first addressed obtaining IRS approval, type of notice needed, and date of notice for forthcoming change in January).

10.  The other document that references another lump sum payment is a file memorandum dated February 7, 1996.